# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

YAN FANG JIANG and
REEDIGROUP LTD.,

                          Plaintiffs,

v.

HANNON GROUP LTD. and
TODD J. HANNON,

                          Defendants.

Case No. 154-CV-309-JPS

ORDER

This case arises out of a contractual dispute relating to the production and sale of lunch bags. (*See generally* Docket #65). The plaintiffs alleged a suite of claims flowing from that dispute, including: (1) breach of fiduciary duty; (2) breach of contract; (3) breach of the implied duty of good faith; (4) conversion; (5) violations of Wis. Stat. § 895.446; and (6) tortious inference. (Docket #65). The defendants' neglectful conduct during the course of the litigation, however, prevented this case being decided on its merits; to date, two default judgments[1] have been entered against them for failing to abide by Court deadlines, causing unnecessary delay, and disregarding applicable Local and Federal Rules of Civil Procedure. (*See* Docket #40, #75). Most recently, the Court granted the plaintiffs' second motion for the entry of default judgment (Docket #66) because the defendants failed to file a timely response to the plaintiffs' amended complaint (*see* Docket #75).

At this stage of the litigation, the Court is left with the sole responsibility of determining an appropriate damage award to compensate

---

[1]The Court, finding good cause to vacate entry of default and that the defendants took quick action to correct their fault, granted a motion to vacate default judgment on February 10, 2015. (Docket #56 at 6).

the plaintiffs' losses. (*See* Docket #75 at 9). At bottom, the plaintiffs' argument is that they are entitled to two sources of monetary damages under the well pleaded facts of the amended complaint: (1) the manufacturing costs of the lunch bags; and (2) a 16% performance fee from the defendants' sales of those lunch bags. (*See* Docket #77 at 2). After accounting for various corrections that were brought to light in the defendants' opposition (Docket #79), the plaintiffs claimed their total damage award to be $3,290,629.05. (*See* Docket #81 at 16). The defendants vigorously dispute this figure, arguing that both the methodology for calculating the plaintiffs' damage award, and the values that went into its formulation, are flawed. (*See generally* Docket #79).

The damages issue has been fully briefed by the parties, and is thus ripe for adjudication.

1.      BACKGROUND[2]

The plaintiff, Yan Fang Jiang ("Jiang"), was in the business of developing, manufacturing, and marketing handbags and related products. (Docket #65 ¶ 10). In 2006, Jiang met Todd Hannon ("Hannon"), who was in China on a business trip. (Docket #65 ¶ 10). The parties' relationship began in 2008 when Jiang and Hannon formed a partnership to manufacture and sell lunchbags. (Docket #65 ¶¶ 14-15). Together they developed a brand of insulated lunch bags known as "Sachi." (Docket #26 ¶ 17).

Operationally, Hannon focused on sales and marketing in the United States, while Jiang focused on design, sourcing materials, and manufacturing in China. (Docket #65 ¶ 18). Specifically, Hannon and his company, Hannon

---

[2]As the Court must accept all well-pleaded allegations relating to liability as true, the facts are taken from the amended complaint. (Docket #65); *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012).

Group, would solicit and collect orders in the United States. (Docket #65 ¶ 25). Those orders would then be filled by Reedigroup, a Hong Kong company set up jointly by the parties. (Docket #65 ¶ 25). Hannon Group would then pay to Reedigroup all of Reedigroup's manufacturing expenses, plus an additional 16% of Hannon's or Hannon Group's sale price per bag, multiplied by the number of bags shipped. (Docket #65 ¶ 25). This 16% fee, otherwise known as the "performance fee," was comprised of an 8% royalty fee and an 8% management fee. (Docket #65 ¶ 25). Initially, Hannon and Jiang were each 50% shareholders of Reedigroup; though in May of 2010 Jiang acquired Hannon's shares and became the sole shareholder of Reedigroup. (Docket #65 ¶¶ 23-24, 26).

Later, in November of 2010, Hannon and Jiang renegotiated the terms of their relationship. (Docket #65 ¶ 28). The parties agreed that Reedigroup would charge to Hannon Group: (1) its expenses of manufacturing, the factory costs *plus* a percentage mark-up; and (2) continue to charge the same 16% performance fee. (Docket #65 ¶ 28). On December 17, 2010, Hannon presented Jiang with a Supply and Manufacturing Agreement ("Supply Agreement"). (Docket #65 ¶ 29). Jiang executed the Supply Agreement on behalf of Reedigroup based on her belief and understanding that it reflected the current agreement of the parties. (Docket #65 ¶ 30). Indeed, notwithstanding the execution of that agreement, the parties continued to operate all aspects of their business relationship as they had since November of 2010, with Reedigroup charging to Hannon Group: (1) its manufacturing costs, plus a percentage markup; and (2) the performance fee, comprised of an 8% royalty fee and an 8% management fee. (Docket #65 ¶ 31).

Business deteriorated in 2013. (Docket #65 ¶ 33). As a result, Jiang began to discuss a large and growing balance owed by Hannon Group. (Docket #65 ¶ 33). Since there was only one primary customer for the lunch bags, the television shopping channel QVC, Inc. ("QVC"), Jiang offered to facilitate other sales of the products in other geographic markets to increase profits. (Docket #65 ¶ 33). In response, Hannon announced that he and Hannon Group alone owned the Sachi brand, and he would market the brand as he saw fit. (Docket #65 ¶ 34). The parties' business dealings further unraveled to the point where Hannon began to: (1) entice Reedigroup's employees to begin working for Hannon Group; (2) establish Hannon Group's own office in China; (3) tell other employees of Reedigroup that Reedigroup was moving; and (4) place orders in the name of Hannon Group directly with Reedigroup's suppliers and manufacturers. (Docket #65 ¶ 37). Additionally, in June of 2013, Hannon contacted one of the factories where Reedigroup was manufacturing Sachi lunch bags, and had all products shipped directly to Hannon Group. (Docket #65 ¶ 38). This series of events caused significant damage to Reedigroup's relationships with its suppliers and manufacturers. (Docket #65 ¶ 37). Reedigroup filed the instant case on March 21, 2014. (Docket #1).

2.    LEGAL STANDARD

As default judgment has been entered against the defendants (Docket #75), the Court must accept all well-pled facts relating to liability as true. *Wehrs*, 688 F.3d at 892. However, that does not relieve the plaintiffs of the responsibility to prove up their damages under Rule 55(b)(2) of the Federal Rules of Civil Procedure. Indeed, "even when a default judgment is warranted based on a party's failure to defend, the allegations in the

complaint with respect to the amount of the damages are not deemed true," and the Court must conduct an inquiry to ascertain the amount of damages with reasonable certainty. *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007) (quoting *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004)). Judgment by default may not be entered without a hearing on damages unless "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *Id.* (quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)).

In Wisconsin,[3] "[a]n award of damages for breach of contract should compensate the injured party for losses necessarily flowing from the breach." *Ma v. Cmty. Bank*, 686 F.2d 459, 466 (7th Cir. 1982) (citing *Repinski v. Clintonville Federal Savings & Loan Assoc.*, 49 Wis.2d 53, 58, 181 N.W.2d 351 (1970)). Compensatory contract damages are designed to put the non-breaching party in the same position had there been no breach and "must be proved with reasonable certainty." *Id.*

In recovery under tort, a plaintiff must prove that the defendant's breach directly and proximately caused his or her damages. *Jones v. Secura*

---

[3]When sitting in diversity, the Court must apply the choice of law principles of the forum state to determine what substantive law governs the proceedings. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). In contract matters such as this one, the Wisconsin Supreme Court utilizes a "grouping-of-contacts approach," as embodied in the Restatement (Second) of Conflicts, to determine the proper law to apply. *Sybron Transition Corp. v. Sec. Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997) (citing *Urhammer v. Olson*, 39 Wis.2d 447, 159 N.W.2d 688 (1968)). In this case, the alleged agreement was negotiated and performed by a Wisconsin resident (*i.e.*, Hannon) and a Wisconsin Corporation (*i.e.*, Hannon Group). (*See* Docket #65). Thus, because the contract in dispute has the most "significant relationship" with Wisconsin, Wisconsin law governs. *See In re Jafari*, 569 F.3d 644, 649 (7th Cir. 2009).

*Ins. Co.*, 2002 WI 11, ¶ 33, 249 Wis. 2d 623, 645, 638 N.W.2d 575, 586. "Tort law is designed to provide full compensation for persons who are injured by another's unreasonable conduct." *N. Air Servs., Inc. v. Link*, 2012 WI App 27, ¶ 16, 339 Wis. 2d 489, 809 N.W.2d 900. Wisconsin courts permit claimants recovering under the tort of breach of fiduciary duty to plead either restitutionary or compensatory damages. *Pro-Pac, Inc. v. WOW Logistics Co.*, 721 F.3d 781, 77-78 (7th Cir. 2013).

3.      DAMAGES

The plaintiffs argue that under the terms of the parties' agreement the Court should look to the following equation in calculating a proper damage award:

 manufacturing costs + performance fee – payments collected – credits due (*see* Docket #77 at 4; Docket #65 ¶¶ 25, 28).

Using this equation as a guide, the plaintiffs provide extensive documentary evidence to prove up their damages. (Docket #76, Exs. 1-8). First, to calculate the manufacturing costs of the lunch bags, the plaintiffs provide all of the invoices sent from Reedigroup to Hannon Group reflecting the bags' manufacturing costs from 2010 until 2013. (*See* Docket #78, Exs. 1-3). This figure originally totaled to $11,743,945.42. (Docket #76, Ex. 2). Second, for the performance fee calculation, the plaintiffs relied on the fact that QVC was the primary customer of the Sachi lunch bags. (Docket #77 at 2). Using Hannon Group's QVC purchase orders (Docket #78, Exs. 4-5), the plaintiffs' original calculations showed that the defendants' total income from QVC purchases during the relevant time frame was $22,225,325.27. (Docket #76, Ex. 5). Third, the plaintiffs provided bank records from the relevant time frame to show all of the payments made by Hannon Group to Reedigroup

over the course of the parties' agreement. (Docket #76, Exs. 6-7). The total amount of payments Hannon Group made to Reedigroup was $11,515,137.40. (Docket #77 at 3). Finally, the only credit that the plaintiffs originally claimed they owed to the defendants was in the amount of $311,289.98. (Docket #77 at 3).

In general, the defendants did not dispute the content of the manufacturing invoices, QVC purchase orders, and bank records. (*See generally* Docket #79). However, the defendants do point out: (1) two QVC purchase orders that were reported in error (Docket #81 at 5); and (2) eight QVC purchase orders that were never fulfilled. (Docket #81 at 6). The plaintiffs conceded both of these errors and reduced their performance fee accordingly. (Docket #81 at 16). In addition, the defendants argued that they are entitled to certain credits based on payments made directly to the lunch bag factories, instead of the plaintiffs. (Docket #79, Ex. 1 ¶ 21). Rather than the $311,289.98 worth of merchandise that the plaintiffs originally calculated, the plaintiffs admitted that the defendants were owed a credit of $358,088.54 for factory-purchased lunch bags. (Docket #81 at 14). Accounting for these errors, then, the plaintiffs' proposed damages calculation became:

$$\$11,743,945.42 + \$3,419,909.57 - \$11,515,137.40 - \$358,088.54$$

which is equal to $3,290,629.05 in damages.[4] (Docket #81 at 16).

---

[4] The plaintiffs' reply brief somewhat restructures this equation, but for the sake of consistency, the Court will continue to use the original format that the plaintiffs proposed. (*See* Docket #81 at 16).

The defendants put forth a litany of additional reasons as to why this calculation is flawed.[5] (*See generally* Docket #79). The defendants argue that:

a.  The nature of the parties' relationship requires a three-part "zone" approach to the damages calculation (Docket #79 at 2);

b.  The plaintiffs' proposed manufacturing costs are flawed because:

   i.   The total amount of Reedigroup's invoices is incorrect (Docket #79, Exs. 12, 16); and

   ii.  The defendants are not liable for any "mark-up" on factory costs (Docket #79 at 8);

c.  The performance fee calculation is flawed because it:

   i.   Relies on an incorrect total of QVC purchase orders (Docket #79 at 4-5);

   ii.  Fails to account for returned merchandise from QVC (Docket #79 at 8); and

---

[5]After the Court's deadline to file an opposition, the defendants filed a response to the plaintiffs' reply titled, "Motion to Strike" and "Motion for Evidentiary Hearing." (Docket #84). Without having been authorized to file a surreply, the defendants' motion contains over fifteen pages of argument responding to the plaintiffs' reply. (Docket #84). Procedurally, the defendants argue that the plaintiffs' reply was untimely (Docket #84 at 1). It was not. *See* Civil L.R. 65(b)(2); Fed. R. Civ. P. 6(a)(1)(C); Fed. R. Civ. P. 6(d). Substantively, this filing raises no new issues from that which were raised in the defendants' original response (*see* Docket #79) and contravenes the Court's express Order regarding the damages briefing schedule (*see* Docket #75 at 9-10). Notably, the plaintiffs have also responded to the defendants' latest motion. (Docket #86). However, as the parties have raised no new arguments, the Court will address them as appropriate herein.

Case 2:14-cv-00309-JPS   Filed 12/10/15   Page 8 of 23   Document 87

Does not deduct certain Hannon Group expenses[6] (Docket #79 at 8);

    d.    Defendants are entitled to three credits:

        i.    A $40,000.00 credit (Docket #79, Ex. 1 ¶ 7);

        ii.    A $83,086.50 credit (Docket #79, Ex. 15);

        iii.    A $477,256.32 credit (Docket #79, Ex. 12); and

    e.    Hannon cannot be personally liable for the damage award (Docket #79 at 11).

Each of these arguments will be discussed in turn.

### 3.1 General Methodology

The parties agree that the damages calculation must reflect their contractual obligations to each other. However, the parties dispute what those obligations were and, thus, how to approach the computation of damages.

On the one hand, the plaintiffs argue that they are entitled to a 16% performance fee on products sold and manufacturing costs accumulated throughout the course of the parties' relationship. (*See generally* docket #77). Even though the parties signed a Supply Agreement in November of 2010, the plaintiffs argue that the payment terms under the agreement were

---

[6]The defendants also argue in their motion for a hearing that the performance fee calculation proposed by the defendant is inconsistent with the terms of the contract as alleged in the plaintiffs' original complaint. (Docket #84 at 2-3). This argument is entirely without merit, as the amended complaint is now the operative pleading in this matter. *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1056-57 (7th Cir. 1998).

generally consistent[7] from 2009 until 2013. (*See* Docket #77 at 1; *see also* Docket #65 ¶¶ 25-31).

The defendants, on the other hand, argue that two significant developments—Jiang's purchase of Hannon's share in Reedigroup and the execution of the Supply Agreement—defined three time periods, or "zones," in which the parties bore distinct obligations. (*See* Docket #79 at 2-3). The first zone corresponded with the time period when Hannon and Jiang were 50% shareholders of Reedigroup, roughly from 2009 until February of 2010. (Docket #79 at 2). The second zone ran from February of 2010 until the parties executed the Supply Agreement in December of 2010. (Docket #79 at 2). The third zone lasted from the time the parties executed the Supply Agreement until their relationship terminated in 2013. (Docket #79 at 2-3). The defendants generally agree that the terms of the parties' agreement during zone 1 and zone 2 were defined by paragraph 25 of the amended complaint. (Docket #79 at 2-3). However, unlike the plaintiffs, the defendants argue that the damages calculation for zone 3 must be governed by the Supply Agreement. (Docket #79 at 3).

The Court must look to the well pled allegations of the amended complaint to determine the nature of the parties' agreement. *Yang v. Harbin*, 37 F.3d 282, 286 (7th Cir. 1994) ("In the context of a default judgment, the district court is obliged to accept as true all facts alleged by the plaintiff and all reasonable inferences contained therein.").

Doing so, it is clear that, as the plaintiffs allege, paragraph 25 of the amended complaint accurately describes the parties' relationship from at

---

[7]The amended complaint indicates, however, that an additional mark-up fee on factory costs was added to the parties' agreement in November of 2010. (Docket #65 ¶ 28). This point will be discussed at length below. *(See infra* Part 3.2).

least 2009 until November of 2010. The parties do not dispute, and the Court agrees, that the parties were liable under contract to each other according to the terms outlined in paragraph 25 of the amended complaint during this time period.[8] (*See* Docket #77 at 2-3; Docket #79 at 23). Paragraph 25 states that Hannon Group was required to "pay to Reedigroup all of Reedigroup's manufacturing expenses, plus an additional 16% of Hannon's or Hannon Group's sale price per bag multiplied by the number of bags shipped, as Jiang's share of the profit." (Docket #65 ¶ 25). In other words, the defendants must pay all of Reedigroup's manufacturing costs and the 16% performance fee for sales that occurred from at least 2009 until November of 2010.

The parties' contractual relationship did not change upon the signing of the Supply Agreement. According to the amended complaint, in November of 2010, the defendants "agreed that Reedigroup would charge Hannon Group, for its expenses of manufacturing, the factory costs plus a percentage mark-up, and in addition, continue to charge an 8% royalty fee and 8% management fee as its share of the profits." (Docket #65 ¶ 28). Thus, the only term that changed as of November of 2010 was the addition of a manufacturing cost "mark-up." (*Compare* Docket #65 ¶ 25 *with* Docket #65 ¶ 28). Thereafter, however, "Jiang executed the Supply and Manufacturing Agreement on behalf of Reedigroup based on her belief and understanding that it reflected the current agreement of the parties. Notwithstanding the execution of the Supply and Manufacturing Agreement [on December 17,

---

[8]As the allegations in the amended complaint do not square with the three-part zone methodology that the defendants propose, the Court will not rely on that analytical framework for the purpose of this Order. (*See* Docket #65). Instead, the Court will apply paragraphs 25-31 of the amended complaint (Docket #65 ¶¶ 25-31), which outline the terms of the parties' agreement, to calculate the appropriate damages in this matter.

2010], Jiang and Hannon continued to operate all aspects of their business relationship as they had since November 2010.…" (Docket #65 ¶¶ 30-31).

These paragraphs indicate that the written terms of the Supply Agreement did *not* alter the parties' contractual obligations; rather, the parties continued to operate with the understanding that the defendants owed to the plaintiffs both manufacturing costs (plus a mark-up) and a 16% performance fee. (*See* Docket #65 ¶¶ 28-31). The defendants, by virtue of their default, have conceded their contractual liability under these facts. *See Wehrs*, 688 F.3d at 892; *see also Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1125 (10th Cir. 2003) (refusing to accept defendant's position that the Court should interpret the terms of the parties' underlying contract because the defendant's default judgment foreclosed any merits-based arguments.)

The defendants' position—that the Supply Agreement's terms control the computation of damages from December 17, 2010 until 2013—is a liability argument. The defendants are, in essence, arguing that they were not bound by the parties' agreement as alleged in the amended complaint. (*See* Docket #65 ¶¶ 25-31). Instead, the defendants argue they were bound under a different agreement, namely, the Supply Agreement and/or a certain course of performance, which changed the terms of the parties' contract. (*See* Docket #79 at 5-8). However, the defendants' liability argument (*i.e.*, we were bound by "x" and not by "y") was foreclosed by virtue of their failing to litigate this case on the merits. *Wehrs*, 688 F.3d at 892; *Olcott*, 327 F.2d at 1125. Any attempt by the defendants to characterize their argument differently is simply a distraction from their endeavor to defend against the claims that they failed to adequately support prior to default.

In sum, the computation of damages is not controlled by the Supply Agreement, but rather the agreement as reflected in the amended complaint. (*See* Docket #65 ¶¶ 25-31). The amended complaint reveals that the only time in which the parties' obligations changed was in November of 2010, when the parties' agreed to an additional mark-up fee on factory costs. (Docket #65 ¶¶ 25, 28, 30-31). Overall, the amended complaint establishes that the damages in this case are derived from essentially two terms, exactly as the plaintiffs argue: manufacturing costs and a performance fee. (*See* Docket #65 ¶¶ 28-31).

### 3.2    Manufacturing Cost Calculation

The parties to do not dispute that at least a portion of the plaintiffs' damage award must be derived from Reedigroup's manufacturing costs. (*See* Docket #77, #79). However, the precise amount of manufacturing costs owed to the plaintiffs is in dispute.

First, the parties disagree as to the sum of Reedigroup's manufacturing invoices. (Docket #81 at 12-13). On the one hand, the plaintiffs provide hundreds of pages, including a summary, of Reedigroup's invoices to the defendants. (Docket #76, Exs. 1-3). According to the plaintiffs, these invoices reveal that the plaintiffs' manufacturing costs totaled to $11,743,945.42. (Docket #77 at 2). On the other hand, the defendants assert that the plaintiffs' manufacturing invoices only totaled to $7,903,828.94. (*See* Docket #79, Exs. 12, 16). In support of this figure, the defendants cite to "Exhibit 14" (Docket #79, Ex. 12) and "Reedigroup's Invoices." (Docket #79, Ex. 16). But, neither Exhibit 14 nor the generic reference to Reedigroup's invoices establish how or why the defendants' calculation is different from the plaintiffs'.

The defendants failure to support their position with proof, *i.e.*, through disputed invoices, etc., leaves the Court with an incomplete picture of the defendants' position. Without a more precise reference or explanation as to what invoices were relied upon and/or disputed in developing the $7,930,167.94 figure, the Court simply cannot accept and adequately address the defendants' calculation.

The plaintiffs' calculations and supporting invoices, in contrast, are definite and supported by thorough documentary evidence. (Docket #76, Exs. 1-3); *see Dundee Cement Co.*, 722 F.2d at 1323 (explaining that courts need not conduct evidentiary hearings on damages in a default judgment case when "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits"). Thus, the Court will accept the plaintiffs' proposal that Reedigroup's manufacturing invoices to the defendants totaled to $11,743,945.42. (Docket #77 at 2).

Second, the defendants argue that the plaintiffs' invoices are flawed because they contain unauthorized mark-ups. (Docket #79 at 4). Based on this observation, the defendants deduct mark-up charges from the plaintiffs' manufacturing invoices in order to determine their proposed manufacturing costs figure. (Docket #79, Exs. 12, 16). The defendants claim that they were able to calculate this mark-up amount by comparing: (1) purchase orders from Reedigroup to Chinese manufacturers; with (2) the invoices from

Reedigroup sent to the defendants.[9] (Docket #79 at 4). This difference thereby provided the defendants with an accurate sense of the "real" manufacturing cost of the Sachi lunch bags. (Docket #79, Exs. 14, 16).

As a preliminary matter, the well pled allegations of the amended complaint state that in November of 2010, the parties explicitly agreed that the plaintiffs would collect "factory costs *plus* a percentage mark-up." (Docket #65 ¶ 28) (emphasis added). Thus, the defendants' argument that they are not liable for mark-ups after November of 2010 under the terms of the Supply Agreement—which is inapplicable to begin with (*see supra* Part 3.1)—is plainly without merit. Any argument to the contrary is a liability argument (*i.e.*, we did not agree to pay "x" under the terms of our agreement) which is inappropriate to litigate at this juncture. *Wehrs*, 688 F.3d at 892; *Olcott,* 327 F.2d at 1125.

However, prior to November 2010, the amended complaint makes no mention of mark-ups having been authorized under the parties' agreement. In fact, the amended complaint highlights the fact that the parties altered their agreement in November of 2010 to include these mark-up fees. (*Compare* Docket #65 ¶ 25 *with* Docket #65 ¶ 28). The plaintiffs do not address this issue; they likewise do not contest the veracity of the defendants' calculated mark-up values or the purchase orders from Reedigroup to the Chinese

---

[9] The defendants apparently obtained the purchase orders from Reedigroup to Chinese manufacturers from Min Li, a former employee of Reedigroup. (Docket #79 at 4-5; Docket #79, Ex. 2). Min Li's affidavit attests to the veracity of the defendants' Exhibit 24, which contains over 77 pages of purchase orders from Reedigroup written in a combination of both Chinese and English. (Docket #79, Ex. 24). Using these purchase orders, the defendants provide a spreadsheet that breaks down the differences between Reedigroup's invoices to the defendants and Reedigroup's invoices to Chinese manufacturers. (*See* Docket #79, Ex. 14).

manufacturers. (*See* Docket #79, Ex. 14). Instead, the plaintiffs support their position that all of the mark-ups were authorized by merely citing to paragraph 28 of the complaint—which corresponds to the parties' agreement beginning in November of 2010—and arguing that the defendants' position is foreclosed by virtue of the default judgment. (Docket #81 at 10).

While the Court agrees that this issue touches on the parties' liability under the contract, there is no allegation in the complaint to support the assertion that the plaintiffs were entitled to mark-ups on factory costs prior to November 2011. (*See* Docket #65 ¶ 25*).* While the plaintiffs may rely on the well pled allegations for the purpose of arguing liability, they cannot create liability arguments from allegations of the amended complaint that are not properly pled. S*ee Wehrs,* 688 F.3d at 892. As it is the plaintiff's burden to prove their damages to a reasonable certainty under Federal Rule of Procedure 55, the Court cannot award mark-ups from April of 2010 until November of 2010. (*See* Docket #79, Ex. 14).

Thus, under the allegations of the well pled amended complaint, the plaintiffs are entitled to their costs of manufacturing from 2009 until 2013, as demonstrated in the invoices that Reedigroup provided to the defendants. (*See* Docket #76, Exs. 1-3). However, the amended complaint demonstrates that the parties agreed to include mark-ups on manufacturing costs in November of 2010, and thus the plaintiffs are only entitled to mark-ups on manufacturing costs that were invoiced on or after that date. (Docket #65 ¶¶ 25, 28). According to the defendants' manufacturing invoices and summary spreadsheets, the total value of those unauthorized mark-ups from 2009 until November of 2010 was $159,746.04. (*See* Docket #79, Exs. 14, 24). The plaintiffs' costs of manufacturing, therefore, total $11,743,945.42, less

Case 2:14-cv-00309-JPS   Filed 12/10/15   Page 16 of 23   Document 87

$159,746.04, which equals $11,584,199.38. (*See* Docket #76, Exs. 1-3; Docket #79, Ex. 14).

### 3.3 Performance Fee Calculation

The 16% performance fee owed to the plaintiffs applied to the "sale price per bag multiplied by the number of bags [that Hannon Group] shipped." (Docket #65 ¶ 25). Because QVC was the defendants' primary customer, the plaintiffs provided all the QVC purchase orders from the relevant time frame in order to calculate the appropriate fee. (Docket #77 at 2-3; Docket #76, Exs. 4-5). In response, the defendants argue that: (1) the plaintiffs' spreadsheet of QVC purchase orders contained two numerical flaws totaling $9,958.64 (Docket #79, Ex. 9 at 1); (2) twelve QVC purchase orders totaling $1,183,257.80 were never fulfilled by the plaintiffs, and thus may not be used to calculate the fee (Docket #79, Ex. 9 at 2); (3) returned items from QVC were not subject to the performance fee (Docket #79 at 5); and (4) various expenses in making QVC sales were deductible from the performance fee (Docket #79 at 5).[10]

The plaintiffs have conceded the first two arguments. *(See generally* Docket #81). First, as discussed above (*see supra* Part 3), the plaintiffs conceded that two line items in their original QVC purchase order spreadsheet were incorrect and, therefore, reduced the proposed QVC purchase order total by $9,958.64. (Docket #81 at 5). Second, the plaintiffs also conceded that Reedigroup did not fulfill eight QVC orders, which totaled

---

[10]The defendants also assert in the context of their mark-up argument that, alternatively, the plaintiffs waived the 16% performance fee by charging mark-ups instead. (Docket #79 at 9). However, as discussed in Parts 3.1 and 3.2, the defendants have forfeited their ability to argue the merits of the plaintiffs' contract claim as a result of their default judgment. (Docket #75); *Wehrs*, 688 F.3d at 892; *Olcott*, 327 F.2d at 1125.

Case 2:14-cv-00309-JPS  Filed 12/10/15  Page 17 of 23  Document 87

$840,931.80 worth of merchandise (Docket #81 at 4-6), and thus have reduced their purchase order and performance fee accordingly.[11]

With regard to the defendants' final two arguments, the plaintiffs assert that returned products and the defendants' expenses were never factored into the 16% performance fee under the contract; as a result, the defendants' deductions on those bases are unfounded. (*See* Docket #81 at 6, 12). The Court finds these arguments persuasive.

The well pled allegations of the plaintiffs' amended complaint do not indicate that the performance fee was subject to a reduction based on returned merchandise and/or the defendants' expenses. (*See* Docket #65). Instead, the terms of the parties agreement is based on the "sale price per bag" and "number of bags shipped." (Docket #65 ¶ 25). Thus, the defendants argument about the performance fee applying only to "net fees" is to no avail. (*See* Docket #79 at 8). The defendants had two opportunities to litigate their interpretation of the contract (*i.e.*, we agreed to "x" and not "y"), but those opportunities were twice waived when they failed to do so. (*See* Docket #45, #75). At this stage of the litigation, the Court finds that the terms of the parties' agreement are unambiguous and do not reference the deductions that defendants propose. (Docket #25 ¶¶ 25, 28). Thus, the Court will not reduce the QVC purchase order total to account for returned lunch bags or the defendants' sales expenses.

In sum, the portion of the plaintiffs' damages corresponding to the performance fee is appropriately derived from the documentary evidence of

---

[11]The plaintiffs provide proof of shipping (packing lists and bills of lading) for the four other purchase orders that the defendants claimed Reedigroup did not fulfill. (*See* Docket #81 at 6; *see also* Docket #82, Exs. 1-4). Thus, the Court finds that these four purchase orders are subject to the 16% performance fee.

Case 2:14-cv-00309-JPS   Filed 12/10/15   Page 18 of 23   Document 87

QVC purchase orders. (*See* Docket #76, Exs., 4-5; Docket #82 ¶ 2). These purchase orders indicate that QVC purchased $22,225,325.27 worth of merchandise, less the $9,958.64 and $840,931.80 deductions that the plaintiffs conceded. (Docket #76, Exs. 4-5; Docket #81 at 5-6). Thus, the QVC purchase orders total to $21,374,434.83, and the 16% performance fee thereof equals $3,419,909.57. (*See also* Docket #81 at 16) (same).

### 3.4    Credits Due[12]

The defendants argue that they are entitled to three credits in the amounts of: (1) $40,000 (Docket #79, Ex. 1 ¶ 7); (2) $83,086.50 (Docket #79, Ex. 15); and (3) $477,256.32 (Docket #79, Ex. 12). The plaintiffs argue that none of these credits are valid. (Docket #81).

First, the $40,000 credit that the defendants propose relates to a payment that the defendants made to Jiang in June of 2009. (*See* Docket #79, Ex. 1 ¶ 7). However, as the plaintiffs point out, Hannon admits that this special payment was made to Jiang for her efforts in developing the Sashi line of products. (Docket #79, Ex. 1 ¶ 7). Thus, the $40,000 had nothing to do with the parties' contractual performance, which is at issue here. As the $40,000 payment did not flow from plaintiffs' manufacturing costs or the performance fee, it is inapplicable to the damage calculation in this case.

Second, the defendants claim that they received a "credit memo" from the plaintiffs in the amount of $83,068.50, which must be applied against the damages award. (Docket #79, Ex. 15). The plaintiffs do not dispute that they

---

[12]The defendants do not contest the bank records and the summary spreadsheet showing the payments that Hannon Group made to the plaintiffs (Docket #76, Exs. 6-7). Because of this, the Court will not address in detail the figure representing the total amount of payments that the defendants made to the plaintiffs, which is $11,515,137.40. (Docket #77 at 3). The plaintiffs have provided ample documentation and proof thereof. (*See* Docket #76, Exs. 6-7).

sent this credit to the defendants because the defendants had overpaid Reedigroup Invoice 02051010RG. (Docket #81 at 11). However, the plaintiffs argue that this figure has already been taken into account by virtue of the plaintiffs' damages methodology. (Docket #81 at 11). In essence, the plaintiffs argue that, under their approach, all of Reedigroup's invoices were totaled and all of the payments received from the defendants were totaled. (Docket #81 at 11). The payments were then subtracted from the total invoice figure. (Docket #81 at 11). Thus, the plaintiffs argue that the overpayment, in effect, is accounted for because it was applied to other invoices. (Docket #81 at 11).

While the Court understands the plaintiffs' logic, the proof supporting that argument is not sufficient to satisfy the plaintiffs' burden. The plaintiffs' argument essentially rests on the premise that the defendants overpaid invoice number 02051010RG. However, the plaintiffs' reply and accompanying exhibits do not point the Court to invoice 02051010RG. The plaintiffs likewise do not highlight the bank records showing that the defendants had overpaid invoice 02051010RG in the amount of $83,068.50. Without proper proof that the credit note was indeed an overpayment that had, in turn, become embodied in the plaintiffs damages calculation, the Court cannot simply assume the plaintiffs have accounted for the undisputed credit. As it is the plaintiffs' burden to do so under Federal Rules of Civil Procedure 55, the Court will accordingly provide the defendants with a credit in the amount of $83,086.50.

Lastly, the defendants argue that they are entitled to a $477,256.32 credit. (Docket #79, Ex. 12). However, the well pled allegations in the amended complaint explicitly state that the defendants had improperly claimed that amount during the course of the parties' business relationship.

(Docket #65 ¶ 32). The amended complaint states that "Jiang and Reedigroup did not agree to any such deduction and there is no basis for it under the parties' agreement." (Docket #65 ¶ 32). Thus, as the Court must accept that "there is no basis" for the defendants' claim to this sum, the defendants' attempt to argue that they are not liable for the $477,256.32 is a dead letter. *Wehrs*, 688 F.3d at 892

Thus, the only additional credit[13] that the defendants will be entitled to is the $83,086.50 amount embodied in the credit note that the plaintiffs admit issuing to the defendants on July 30, 2010. (Docket #79, Ex. 15; Docket #81 at 11).

### 3.5    Todd Hannon's Liability

The defendants argue that Hannon cannot be individually liable for the damage award because the contract giving rise to the plaintiffs' breach of contract claim was only entered into between Reedigroup and Hannon Group. (Docket #79 at 11). The defendants' argument obfuscates the nature of the default judgment entered against them. (*See* Docket #75).

Hannon is jointly liable for the damage award issued in this matter as the final default judgment in this case was entered against both Hannon Group as a corporation *and* Hannon as an individual. (*See* Docket #75). The Court's entry of default judgment found that Hannon breached his fiduciary duty for, among other things: (1) refusing to pay the plaintiffs for agreed upon performance fees; (2) deducting the plaintiffs' profits without

---

[13]As discussed above, the plaintiffs also conceded that the defendants were entitled to a larger credit—in the amount of $358,088.43—for merchandise that the defendants purchased directly from factories. (*See* supra Part 3.0; Docket #81 at 13-14). As this issue has been properly disposed of by the parties', the Court will not discuss it further here.

authorization; (3) claiming that the plaintiffs had no interest in the Sachi brand; and (4) exercising unilateral control over the Sachi brand.[14] (Docket #65 at 7). While the damage award in this case is primarily calculated on the basis of the plaintiffs' entitlement to compensatory damages under contract law, Hannon is still liable for his breach of fiduciary duty, which may be remedied by compensatory damages to the plaintiff. *Pro-Pac, Inc.*, 721 F.3d at 777-78. Thus the compensatory damage award calculated in this case will be entered jointly against both defendants.

4.      CONCLUSION

In sum, the well pled allegations in the amended complaint indicate that the plaintiffs' damages must be derived from the equation:

manufacturing costs + performance fee - payments collected - credits due (*see supra* Part 3). Using the above analyses and resultant calculations, the damage award is therefore equal to:

$11,584,199.38 + $3,419,909.57 - $11,515,137.40 - $358,088.54 - $83,086.50, which is $3,047,796.51. This $3,047,796.51 award is joint with respect to the defendants.

Accordingly,

IT IS ORDERED that the plaintiffs, Yan Fang Jiang and Reedigroup LTD, have and recover from the defendants, Hannon Group LTD and Todd J. Hannon, jointly and severally, damages in the aggregate totaling $3,047,796.51, together with such costs as may be awarded and taxed by the Clerk of Court.

_____

[14]In addition, both Hannon Group and Todd Hannon were jointly and severally liable for conversion, violations of Wis. Stat. § 895.446, and tortious interference with a contract. (*See generally* Docket #65). However, the plaintiffs have elected to waive damages on those claims. (Docket #77 at 4-5).

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of December, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge